UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| _____ ) | |
| CONSERVATION LAW FOUNDATION, INC.,    ) | |
| ) | |
| Plaintiff    ) | |
| ) | |
| v.    ) | Case No. 1:22-cv-00067-JL |
| ) | |
| PROLERIZED NEW ENGLAND, LLC;    ) | |
| JOINT VENTURE OPERATIONS, INC.;    ) | |
| PROLERIDE  TRANSPORT SYSTEMS, INC.;    ) | |
| and MAINE METAL RECYCLING, INC.,    ) | |
| ) | |
| Defendants.    ) | |
| _____ ) | |

## CONSENT DECREE

WHEREAS, Plaintiff Conservation Law Foundation ("CLF" or "Plaintiff") filed this action on February 22, 2022 against Prolerized New England, LLC; Joint Venture Operations, Inc.; Proleride Transport Systems, Inc.; and Maine Metal Recycling, Inc. (collectively "Defendants") alleging violations of the Clean Water Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "Act"), and seeking declaratory and injunctive relief, civil penalties, and attorney fees and costs;

WHEREAS, CLF is a non-profit environmental organization incorporated in Massachusetts and with offices in New Hampshire, Vermont, Maine, Rhode Island, and Connecticut;

WHEREAS, Defendants operate three scrap metal facilities in New Hampshire, namely: the "Concord-Poplar Facility," located at 11 Poplar Avenue in Concord, New Hampshire 03301 (formerly located at 14 Poplar Avenue); the "Concord-Sandquist Facility," located at 25 Sandquist Street in Concord, New Hampshire 03301; and the "Manchester Facility," located at

1

200 Allard Drive in Manchester, New Hampshire 03103 (collectively, the "Facilities");

WHEREAS, CLF alleges in its complaint dated February 22, 2022 (the "Complaint") that Defendants violated the 2015 and 2021 Multi-Sector General Permits for Stormwater Discharges Associated with Industrial Activity (the "2015 MSGP" and the "2021 MSGP," collectively, the "MSGPs") and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and applicable regulations;

WHEREAS, this Consent Decree is a settlement of disputed facts and law and is not an admission or adjudication regarding any allegations by CLF in this case nor evidence of any wrongdoing or misconduct on the part of Defendants;

WHEREAS, Plaintiff and Defendants (collectively the "Parties") have negotiated this Consent Decree in good faith and at arm's length and agree that the settlement of the above-captioned action (the "Action") through this Consent Decree without further litigation is in the public interest and is a fair, reasonable, and appropriate means of resolving all claims in the Action;

WHEREAS, the Parties anticipate that this Consent Decree will enhance the environment by improving water quality in New Hampshire;

WHEREAS, the Parties consent to the entry of this Consent Decree without further trial, argument, or appeal;

WHEREAS, pursuant to 33 U.S.C. § 1365(c), this Consent Decree is being forwarded to the United States Department of Justice and to the United States Environmental Protection Agency ("EPA") for the 45 day review period mandated by the Clean Water Act;

NOW, THEREFORE, before the taking of any testimony, below, and with the consent of the Parties,

IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I.        JURISDICTION AND VENUE

1.        This Court has jurisdiction over this action, the subject matter herein, and over the Parties consenting hereto, pursuant to 33 U.S.C. § 1365(a)(1) (Clean Water Act jurisdiction) and 28 U.S.C. § 1331 (federal question). An actual, justiciable controversy exists between the Parties. The requested relief is authorized under 28 U.S.C. §§ 2201-2202 and 33 U.S.C. § 1365(c)(1).

2.        Venue properly lies in this Court and district pursuant to 33 U.S.C. § 1365(c)(1), because the events giving rise to this action occurred at the Defendants' Facilities in Concord, New Hampshire and Manchester, New Hampshire, which are located within this judicial district.

3.        Plaintiff gave the Defendants notice by letter (the "Notice Letter") of the violations alleged in the Complaint more than 60 days prior to commencement of this lawsuit. Copies of the Notice Letter were also mailed to the Administrator of the EPA, the Acting Regional Administrator of EPA Region 1, the Department of Justice Citizen Suit Coordinator, and the New Hampshire Department of Environmental Services ("NHDES"). Neither EPA nor NHDES commenced any action prior to Plaintiff's filing of the Complaint.

4.        The Defendants consent to this Court's jurisdiction and to venue in this judicial district. The Defendants consent to and shall not challenge entry of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree.

5.        This Court shall retain jurisdiction over this case until the Termination Date for the purpose of resolving disputes arising under this Consent Decree or entering orders modifying this Consent Decree, pursuant to Sections X (Dispute Resolution) and XIII (Modification) or effectuating or enforcing compliance with the terms of this Consent Decree.

3

## II.  RELEASE

6.    This Consent Decree is a full and complete settlement and release of all the claims in the Complaint and the Notice Letter and all other claims known or unknown existing as of the date of entry of the Consent Decree and arising from operation of the Facilities that could be asserted under the Clean Water Act, 33 U.S.C. §§ 1251-1387. Upon termination of this Consent Decree, these claims are released and dismissed with prejudice. Enforcement of this Consent Decree is Plaintiff's exclusive remedy for any violation of its terms.

7.    With the exception of actions to enforce this Consent Decree, during the term of the Consent Decree, CLF will not support, financially or otherwise, any person to sue the Defendants for any and all claims alleged against the Defendants in the Complaint and all other claims known and unknown, existing as of the Effective Date that could be asserted under the Clean Water Act, arising from operation of the Facilities.

## III.    APPLICABILITY

8.    Upon the Effective Date, the obligations of this Consent Decree shall apply to, and be binding upon, the Parties and their respective successors and assigns.

9.    The duties and obligations under this Consent Decree shall not be modified, diminished, terminated, or otherwise altered by the transfer of any legal or equitable interest in the Facilities or any part thereof. However, if a Facility ceases industrial operations and submits a notice of termination ("NOT"), the requirements of Sections V (Compliance Measures), VI (Compliance Monitoring and Reporting), and VIII (Stipulated Payments) *infra* shall no longer apply to that Facility.

10.    If, during the pendency of this Consent Decree, the Defendants cease to operate any of the Facilities, and if there is a successor to the operations, the Defendants shall serve a

4

copy of this Consent Decree upon the successor operator at least 30 days prior to the contemplated transfer of operations and shall contemporaneously inform the Plaintiff of such transfer. In the event of a transfer of operations, the Parties shall petition the Court to modify the Consent Decree to substitute the successor operator for the Defendants as a party hereto, as agreed to by Plaintiff and the owner of the Facility.

11.     In any action to enforce this Consent Decree, Defendants shall not raise as a defense the failure by any of its officers, directors, employees, or agents to take any actions necessary to comply with the provisions of this Consent Decree.

## IV.   DEFINITIONS

12.     Terms used in this Consent Decree that are defined in the Clean Water Act, in regulations promulgated by EPA pursuant to the Act, or in the 2021 MSGP shall have the meanings assigned to them in the Act, such regulations, or in the 2021 MSGP unless otherwise provided in this Consent Decree. Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

  a.     "30% Design": The design drawing for Infrastructure Improvements prepared to an approximately 30% level. The 30% Design shall include an estimated construction schedule; engineering plans showing a plan view layout of proposed improvements, showing grading, paving, and stormwater infrastructure, and showing profiles of gravity conveyance lines; and a basis of design report.

  b.     "60% Design": The design drawing for Infrastructure Improvements prepared to an approximately 60% level and suitable for seeking permitting approval from local permitting authorities, as needed. The 60%

5

Design shall include: any permit application package, engineering plans, stormwater technical reports, State or National Environmental Policy Act documentation if needed, and other deliverables necessary for permitting approval.

c.  "100% Design: The complete and final design drawings and specifications for Infrastructure Improvements suitable for procuring equipment and guiding construction activities.

d.  "Annual Report": The yearly report required under Section 7.4 of the 2021 MSGP.

e.  "Best Management Practices ("BMPs")": Stormwater control measures, not including infrastructure construction or the installation of new stormwater treatment systems, designed to minimize pollutant discharges. BMPs may, as necessary, include more frequent cleaning, sweeping, inspection and maintenance of drain inlet protection, reducing exposure of sources of stormwater pollution, and routine maintenance and repair of existing stormwater control infrastructure. The BMPs shall include all operations, maintenance, and other practices currently required by each Facility's applicable Stormwater Pollution Prevention Plan, as well as the BMPs detailed in Exhibit A to this Consent Decree.

f.  "Corrective Action Triggering Events": Those events which are defined as either "Conditions Requiring SWPPP Review and Revision to Ensure Effluent Limits are Met" in Section 5.1.1 of the 2021 MSGP or as "AIM Triggering Events" in 5.2.2 of the 2021 MSGP.

6

g.    "Discharge Monitoring Report": The quarterly stormwater monitoring
report required under Sections 4.1.9, 7.1, and 7.3 of the 2021 MSGP.

h.    "Effective Date": The date upon which this Consent Decree is entered by
the Court or a motion to enter the Consent Decree is granted, whichever
occurs first, as recorded on the Court's Docket.

i.    "Environmentally Beneficial Projects": Projects consisting of water
quality improvement measures and/or educational programs with the goal
of promoting restoration, preservation, protection, or other beneficial
impacts on water quality in the Merrimack River. These projects will be
implemented by the Implementing Organization pursuant to the terms
provided in Exhibit B.

j.    "Fully Operational": Fully installed, calibrated, and operating.

k.    "Implementing Organization": The third-party entity, Merrimack River
Watershed Council, implementing the Environmentally Beneficial
Projects described in Exhibit B of this Consent Decree.

l.    "Infrastructure Improvements": The construction or implementation of
infrastructure at the Facilities designed so that discharges comply with the
2021 MSGP.

m.    "Monitoring Point": The locations at the Facilities where each Facility
collects stormwater samples pursuant to Section 4 of the 2021 MSGP, as
identified by the applicable Stormwater Pollution Prevention Plan for each
Facility.

n.    "Quarterly Inspection Report": The documentation required under

7

Section 3.1.6 of the 2021 MSGP and Exhibit A of this Consent Decree.

o.      "Stormwater Pollution Prevention Plan": The plan required under Section 6 the 2021 MSGP.

p.      "Termination Date": The date on which the Consent Decree term ends, which is five years after the Effective Date pursuant to Section XII (Effective Date and Termination).

q.      "Water Quality Standards": the standards established pursuant to 33 U.S.C. § 1313 and listed at N.H. CODE ADMIN. R. ANN. Env-Wq §§ 1700 *et seq*.

13.    In the Consent Decree, unless the context otherwise requires:

a.      References to Paragraphs, Sections, and Exhibits are references to paragraphs, sections, and exhibits of the Consent Decree;

b.      The descriptive headings of the several Sections of the Consent Decree are inserted for convenience only, do not constitute a part of this Decree and shall not affect in any way the meaning or interpretation of the Consent Decree;

c.       "Include", "includes", and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of similar import; and

d.       References to "Dollars", "dollars," or "$" without more are references to the lawful currency of the United States of America.

14.    All references to a duration of "days" shall be calendar days unless otherwise specified. In computing any period of time under the Consent Decree, where the last day would

8

fall on a Saturday, Sunday, federal holiday, or New Hampshire state holiday, the period shall run until the close of business of the next business day.

## V.     COMPLIANCE MEASURES

15.     The Defendants shall comply with the 2021 MSGP, the Clean Water Act, and applicable Clean Water Act regulations. The 2021 MSGP and subsequent MSGPs, as may be updated from time to time, are incorporated into the Consent Decree by reference.

16.     The Defendants shall implement and/or maintain BMPs to control stormwater at its Facilities as identified in Exhibit A. The Defendants shall continue to maintain the BMPs as necessary until the Termination Date.

17.     The Defendants shall install and/or construct Infrastructure Improvements at the Facilities. The Infrastructure Improvements shall be designed for each of the Facilities to meet the requirements of the 2021 MSGP, in accordance with the schedules and processes set forth in Paragraphs 18-21.

18.     The Defendants shall install and/or construct the following Infrastructure Improvements and facility use modification at the Concord-Poplar Facility:

    a.     Infrastructure Improvements to treat all stormwater captured by the catch basins and drainage systems which will include a hydrodynamic separator and either a lined retention pond or above-ground storage tank, as well as an advanced treatment system if necessary to meet the MSGP benchmarks;

    b.     Perimeter controls to route all stormwater to the stormwater management system; and

9

      c.      A facility use modification of ceasing all operations at the southern portion of the site and placing a barrier between it and the operating portions of the Facility to prevent encroachment of metal recycling operations.

19.     The Defendants shall install and/or construct the following Infrastructure Improvements at the Concord-Sandquist Facility:

      a.      An advanced stormwater management system to treat all stormwater captured by the catch basins and drainage system; and

      b.      Perimeter controls to route all stormwater to the advanced stormwater management system.

20.     The Defendants shall install and/or construct the following Infrastructure Improvements at the Manchester Facility:

      a.      An advanced stormwater management system to treat all stormwater captured by the catch basins and drainage system; and

      b.      Perimeter controls to route all stormwater to the advanced stormwater management system.

21.     The activities required in Paragraphs 18-20 shall be conducted according to the following schedule:

      a.      The Defendants shall submit the 30% Designs to CLF for review and comment by January 31, 2024.

      b.      The Defendants shall submit the 60% Design to CLF for review and comment within four months of responding to CLF's comments on the 30% Designs.

120877192.1 0068163-00156

    c.    The Infrastructure Improvements for the Facilities shall be Fully Operational within one year of receiving all required permitting approvals. Should the Defendants find themselves unable to make the Infrastructure Improvements Fully Operational within the timeframe set forth herein, the Defendants shall follow the procedure provided in Paragraph 44; and

    d.    The Defendants shall submit a revised Stormwater Pollution Prevention Plan for the Facilities to CLF by the later of 30 days after all Infrastructure Improvements at each Facility become Fully Operational or 30 days after the effective date of the Consent Decree.

22.    CLF shall respond to the Defendants' submission of 30% Designs and 60% Designs with suggested revisions and areas for improvement, if any. The Defendants shall consider CLF's concerns and requests for revisions in good faith and respond to CLF's comments within one month of receiving the comments by either resubmitting revised plans and/or preparing a written response to CLF's comments.

23.    Prior to beginning construction, the Defendants shall provide CLF with the 100% Designs. The 100% Designs and the constructed Infrastructure Improvements shall be substantially consistent with the 60% Designs, subject to potential amendments to be discussed between the Parties if such needs arise during construction.

### VI.    COMPLIANCE MONITORING AND REPORTING

24.    After the Infrastructure Improvements are Fully Operational, the Defendants shall permit CLF and/or any CLF representatives to conduct one stormwater site inspection per Facility. The site inspection shall occur during normal business hours. During the site inspection,

120877192.1 0068163-00156

CLF representatives may collect samples, take photos at the Facility, and monitor compliance with the MSGP and the Consent Decree.

25.     By January 30 of each year until the Termination Date, the Defendants shall submit a Progress Report to CLF that describes the status of the BMPs and Infrastructure Improvements, including an explanation of whether such upgrades have been completed or implemented and any delays in construction or implementation.

26.     The Defendants shall comply with all inspection, monitoring, and reporting requirements set forth in the 2021 MSGP.

27.     Starting from the date that the Infrastructure Improvements for each Facility are Fully Operational or the effective date of this Consent Decree (whichever is later), the Defendants shall conduct monthly benchmark monitoring in accordance with the requirements for quarterly monitoring under the 2021 MSGP. In the absence of a qualifying storm event, Defendants must take a substitute sample during the next qualifying storm event (i.e., if adverse weather makes sampling impossible one month, Defendants must take two samples in the following month: the substitute sample and the regularly scheduled sample). In the event there are fewer than three qualifying storm events in a quarter, Defendants must sample each qualifying storm event but are excused from the obligation to take any other samples during the quarter. At such time that the results show that a Facility's discharge did not exceed a benchmark for a parameter for nine consecutive months, that Facility will cease monitoring monthly for that parameter and will begin monitoring quarterly for that parameter through the term of the Consent Decree. For example, once the Infrastructure Improvements are constructed or installed at the Manchester Facility and its monitoring results show that its discharge for nine consecutive months has not exceeded the benchmark for copper, the Manchester Facility will cease

monitoring monthly for copper and will begin monitoring quarterly for copper. For the purpose of calculating consecutive months of compliance, and assuming monitoring was conducted in compliance with this Paragraph, a month where no monitoring was conducted for a given parameter shall be treated the same as a month where the Facility's discharge exceeded the benchmark for that parameter (except where such monitoring was excused in the absence of a qualifying storm event).

28.     Monitoring shall be conducted pursuant to the procedures and requirements in the 2021 MSGP. If monitoring is not conducted pursuant to the procedures and requirements in the 2021 MSGP, the Defendants shall submit documentation to CLF with the Quarterly Inspection Report explaining how and why monitoring deviated from the procedures and requirements of the 2021 MSGP.

29.     During the Consent Decree term, the Defendants shall send to CLF monthly benchmark monitoring results, quarterly Discharge Monitoring Reports, laboratory reports, and Quarterly Inspection Reports for each Facility within 30 days after the end of each calendar quarter. During the Consent Decree term, the Defendants shall send to CLF the Facilities' Annual Reports by January 30 of each year.

30.     During the Consent Decree term, the Defendants shall provide copies to CLF of all documents submitted to the EPA, NHDES, or any of the municipalities in which the Facilities are located related to Clean Water Act compliance at the Facilities, BMPs, or the Infrastructure Improvements. Such documents shall be provided to CLF within 30 days after the end of each calendar quarter.

31.     All documentation required to be submitted pursuant to Paragraphs 29-30 for the final quarter of the Consent Decree term shall be due to CLF within 45 days after the Termination Date.

## VII.    PAYMENTS

A.     Environmentally Beneficial Project

32.     The Defendants shall pay a total of $600,000 to fund an Environmentally Beneficial Project pursuant to the terms provided in Exhibit B on or before 90 days following the Effective Date.

33.     The Defendants shall not deduct any penalties or payments paid under Section VII (Payments) or Section VIII (Stipulated Payments) in calculating its federal, state, or local income tax.

34.     CLF will request from the Implementing Organization annual status reports which are due each year on the anniversary of the payment deadline in Paragraph 32 while funds are being spent. CLF will arrange to have the annual status reports provided to the Defendants, pursuant to the notice provision in Section XI (Notices). The status reports will include, at a minimum, the following information: (i) description of activities completed to date and related expenditures of Project Funds and (ii) a discussion of any anticipated changes to the scope or timeline of the Environmentally Beneficial Project.

B.     Costs of Litigation

35.     Consistent with 33 U.S.C. § 1365(d), within 30 days of the Effective Date, the Defendants shall pay $107,635 by wire transfer, company check, or other agreed upon payment method to Plaintiff as reimbursement for CLF's attorneys' fees and costs incurred or to be incurred in this matter, including any future attorneys' fees and costs relating to the

14

implementation or monitoring of compliance with this Consent Decree.

C.    Late Fees

36.    The Defendants shall pay $750 per day for any payments made pursuant to Consent Decree Sections VII.A, VII.B, or VIII that is more than 14 calendar days late ("Late Fee").

37.    The Defendants shall pay any Late Fees within 14 days of any missed payment deadline pursuant to Sections VII.A, VII.B, or VIII of this Consent Decree.

38.    Late Fees for the late payment of Plaintiff's attorneys' fees and costs shall be paid to CLF. All other Late Fees shall be paid to the Implementing Organization.

## VIII.    STIPULATED PAYMENTS

39.    From the Effective Date until the Infrastructure Improvements are Fully Operational, pursuant to Paragraphs 18-21, the Defendants shall pay stipulated payments to the Implementing Organization in the amount of $750 per Facility per quarter for each failure to monitor a Monitoring Point as required by the 2021 MSGP. If Defendants fail to monitor at a Monitoring Point, Defendants shall owe stipulated payments in the total amount of $750 per Monitoring Point. Stipulated payments shall not be calculated per parameter.

40.    From the date on which the Infrastructure Improvements are Fully Operational, pursuant to Paragraphs 18-21, until the Termination Date, the Defendants shall pay stipulated payments to the Implementing Organization for the following events:

> a.    Benchmark exceedances of any monitoring parameters required by the MSGP: $1,250 for the first calendar quarter following the Infrastructure Improvements becoming Fully Operational if the average of that quarter's three monthly samples exceeds a parameter's 2021 MSGP sector-specific

benchmark. For each subsequent calendar quarter in which the average of

that quarter's three monthly samples exceeds a parameter's 2021 MSGP

sector-specific benchmark, the Defendants shall pay $7,500 per calendar

quarter. For the avoidance of doubt, if this provision is triggered, the

Defendants will pay a single stipulated payment per quarter per Facility.

b.      $7,500 per Facility per quarter in which there occurs any of the following

Corrective Action Triggering Events:

  i.      An unauthorized release or discharge, pursuant to Section 5.1.1.1

  of the 2021 MSGP, or

  ii.      A visual assessment shows odor, foam, or oil sheen in the

  discharge, pursuant to Sections 3.2.2.4 and 5.1.1.5 of the 2021

  MSGP.

c.      $1,250 per Facility per quarter in which there occurs any Corrective

Action Triggering Event not listed in Paragraph 40.b; and

d.      $2,500 per Monitoring Point per month for each failure to conduct

monthly monitoring or, alternatively, $7,500 per quarter for each failure to

conduct quarterly monitoring at a Monitoring Point required pursuant to

the 2021 MSGP or Paragraph 27 of the Consent Decree. If Defendants fail

to monitor at a Monitoring Point, Defendants shall owe stipulated

payments in the total amount of $2,500, or alternatively $7,500, and shall

not owe stipulated payments for each individual parameter that

Defendants failed to monitor.

41.      From the Effective Date until the Termination Date, Defendants shall pay

16

stipulated payments in the amounts specified below to the Implementing Organization for the following events:

    a.    $125 per day for each failure to complete and submit to EPA a report required under the 2021 MSGP;

    b.    $125 per day for each failure to provide CLF with a report or other documentation required under Section VI (Compliance Monitoring and Reporting) of the Consent Decree; and

    c.    $1,250 per week beginning one week after the deadline for each failure to timely complete a required action under Section V (Compliance Measures) of the Consent Decree.

42.    All stipulated payments pursuant to this Consent Decree shall be paid to the Implementing Organization within 30 days of the triggering event.

## IX.    FORCE MAJEURE

43.    "Force majeure," for purposes of the Consent Decree, is defined as any event arising from causes beyond the control of the Defendants, of any entity controlled by the Defendants, or of the Defendants' contractors that delays or prevents the performance of any obligation under the Consent Decree despite the Defendants' commercially reasonable efforts to fulfill the obligation. A minor increase in costs (less than 25%), a change in financial circumstances, or the Defendants' economic inability to comply are not Force Majeure events. Force Majeure events shall include, but not be limited to, acts of God including earthquakes, hurricanes, and other unusually adverse natural or weather conditions; war, insurrection, or civil disturbance; strikes; restraint by court order or order of public authority; supply chain constraints which delay the delivery of supplies and/or equipment by one month or more and where

17

comparable supplies and/or equipment are not available; and delays associated with or caused by pandemics. During the period of any Force Majeure events, stipulated payments shall not accrue.

## X.    DISPUTE RESOLUTION

44.    If any event occurs that causes or may cause delay in the performance of any obligation under the Consent Decree, Defendants shall notify CLF within 10 working days of the date on which Defendants became aware of the potential delay. Upon notification, CLF shall have the right to request all necessary documentation explaining the potential delay. If requested, Defendants shall have 10 working days from the date of the request to provide the documentation. CLF shall have the right to grant all or part of any extension requested by the Defendants. If the delay in Defendants' performance of any obligation under the Consent Decree is due to a Force Majeure event and the Parties cannot reach agreement, the provisions of Paragraph 47 of this Consent Decree shall govern. Defendants shall not be required to pay stipulated payments during the time between the date on which CLF receives such a request from Defendants and the date on which a final decision is issued regarding such request. If CLF denies Defendants' request for an extension, Defendants shall pay all stipulated payments that were deferred during the pendency of the request, unless Defendants invoke the process under Paragraph 47 and prevail.

45.    The Parties agree to work together in good faith to resolve any disputes prior to engaging in the dispute resolution process described in Paragraph 47 or bringing disputes before the Court as described in Paragraph 48.

46.    The following types of disputes shall be resolved pursuant to the binding dispute resolution process described in Paragraph 47:

a.      Disputes arising from delays due to Force Majeure events as described in Paragraph 43; and

b.      Disputes over whether Defendants have triggered an obligation to pay a stipulated payment and in what amount.

47.      If the Parties are unable to resolve any disputes listed in Paragraph 46, the Parties shall mutually select a neutral third party to make a binding determination (the "Arbitrator"). To seek a determination from the Arbitrator, the party seeking a determination shall submit documentation to the Arbitrator and provide a copy to the other party at that time. The other party shall have 14 days to respond by submitting their own documentation. If the Parties remain in disagreement after submission of the documentation, the Arbitrator shall review the submitted documentation and issue a written, binding, and non-appealable determination to both Parties simultaneously. The Arbitrator's fees shall be paid by the non-prevailing party.

48.      Jurisdiction shall be retained by the Court to enforce the terms and conditions of the Consent Decree, to modify the Consent Decree, and to resolve all other disputes not listed in Paragraph 46.

## XI.    NOTICES

49.      Unless otherwise provided herein, whenever notifications, submissions, or communications are required by the Consent Decree, they shall be made in writing and addressed as follows:

For Plaintiff:
Clean Air and Water Paralegal
Ruby Verbitsky
Conservation Law Foundation
62 Summer Street
Boston, MA 02110
rverbitsky@clf.org

<u>For the Defendants</u>
General Counsel
Schnitzer Steel Industries, Inc.
299 SW Clay Street; Suite 350
Portland, OR 97201
generalcounsel@schn.com

      and

Beth Ginsberg
Stoel Rives LLP
600 University Street, Suite 3600
Seattle, WA 98101-4109
beth.ginsberg@stoel.com

50.     Any Party may, by written notice to the other Party, change its designated notice recipient, address, or means of transmittal provided above.

51.     All notifications, communications, or submissions made pursuant to this Section shall be sent by electronic mail. Any Party planning a communication by non-electronic means should first attempt to contact the opposing Party to confirm the appropriate mailing address.

## XII.   EFFECTIVE DATE AND TERMINATION

52.     The Effective Date of the Consent Decree shall be the date upon which the Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's Docket (the "Effective Date"). All obligations arising under the Consent Decree shall become effective as of the Effective Date.

53.     The Consent Decree shall terminate five years after the Effective Date on the "Termination Date".

120877192.1 0068163-00156

## XIII.   MODIFICATION

54.    The terms of the Consent Decree may be modified only by a subsequent written agreement signed by the Parties. Where the modification constitutes a material change to any term of the Consent Decree, it shall be effective only upon approval by the Court.

## XIV.   SIGNATORIES/SERVICE

55.    Each undersigned representative of the Parties certifies that they are fully authorized to enter into the terms and conditions of the Consent Decree and to execute and legally bind the Party they represent to this document.

## XV.    SEVERABILITY

56.    The provisions of this Consent Decree shall be severable, and should any provision hereof be declared invalid or unenforceable, the remainder shall continue in full force and effect between the parties.

## XVI.   INTEGRATION

57.    The Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Consent Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.

## XVII. FINAL JUDGMENT

58.    Upon approval and entry of the Consent Decree by the Court, the Consent Decree shall constitute a final judgment of the Court as to the Plaintiff and the Defendants.

120877192.1 0068163-00156

# SIGNATURE PAGE

**Conservation Law Foundation, Inc.**

By: _____   Date: _11/17/2023_____

Heather A. Govern
Conservation Law Foundation
62 Summer Street
Boston, MA 02110

**Prolerized New England LLC**

By: _____   Date: _11/16/23_____

W. Brandon Peele
Vice President of its Members
Prolerized New England LLC

**Joint Venture Operations, Inc.**

By: _____   Date: _11/16/23_____

W. Brandon Peele
Vice President
Joint Venture Operations, Inc.

**Proleride Transport Systems, Inc.**

By: _____   Date: _11/16/23_____

W. Brandon Peele
Vice President
Proleride Transport Systems, Inc.

**Maine Metal Recycling, Inc.**

By: _____   Date: _11/16/23_____

W. Brandon Peele
Vice President
Maine Metal Recycling, Inc.

Dated and entered this ___ ___Day of _____, _____.


_____
United States District Court Judge

**EXHIBIT A**

**Best Management Practices**

I.      **BMPs to be Implemented by Defendants at the Facilities**

A.  Defendants shall maintain at least 2 cubic yards of container capacity for collecting oily debris from any fluid release incident cleanup.

B.  Defendants shall document in the SWPPP and associated Site Plan any new activities that could expose stormwater to pollutants.

C.  Every week, Defendants shall sweep all paved areas at the Facilities with a mechanical sweeper, including around all storm drains and stormwater inlets. Defendants shall collect yard sweepings in a location protected from stormwater and dispose of these materials in an authorized landfill.

D.  Every month, Defendants shall:

1.  Inspect and remove any sediment and debris accumulation around the stormwater conveyance infrastructure, in and around surface flow paths at catch basins, and on the ground surfaces surrounding each of the catch basins;

2.  Ensure that control measures and inlet protection measures such as catch basin filters and covers are installed at all catch basins;

3.  Clean the secondary containment of all fuel storage tanks at the Facilities; and

4.  Inspect all oil/water separators at the Facilities and document the thickness of accumulated oil and sediment layers. If the inspections identify conditions which exceed the sludge and/or oil content guidelines (1-3) listed

24

in the *OWS Cleaning Procedures* section of the Central Massachusetts

Region Stormwater Coalition SOP 11: Oil/Water Separator Maintenance,

Defendants shall remove any floating debris and trash, accumulated

sediments, and/or floating hydrocarbons in accordance with the SOP.

Defendants shall provide documentation of the monthly oil/water separator

inspections with the Quarterly Inspection Report that will be provided to

CLF pursuant to Paragraph 29.

5. Inspect the catch basins at the Facilities for accumulated sediment. If the

inspections identify conditions which exceed the catch basin debris

guidelines in Part 2.1.2.3.a.v of the 2021 MSGP, Defendants shall clean the

catch basins in accordance with the requirements in the 2021 MSGP.

Defendants shall provide documentation of the monthly catch basin

inspections with the Quarterly Inspection Report that will be provided to

CLF pursuant to Paragraph 29.

E. Defendants shall clean or replace catch basin inserts at the Facilities, as needed.

F. Annually, Defendants shall:

1. Inspect and repair if necessary all catch basin inlets at the Facilities; and

2. Replace X-Tex filter fabric, sorbent socks, and straw wattles at all

stormwater drains at the Facilities.

G. After large precipitation events (more than 3.5 inches in 24 hours), Defendants shall:

1. Inspect the straw wattles at the Facilities and perform maintenance as

needed.

25

**II.    Best Management Practices to be Implemented by Defendants at the Concord-Sandquist Facility**

A.   Continue storing turnings inside an appropriate building; and

B.   Continue to keep wire storage area clear of any stockpiling of soil, asphalt, and concrete.

120877192.1 0068163-00156

**EXHIBIT B**

## I.    ENVIRONMENTALLY BENEFICIAL PROJECT DESCRIPTIONS

Implementing Organization: Merrimack River Watershed Council (MWRC)

Project Funds: $600,000

Waterbody Benefitted: Merrimack River and its tributaries

Project Descriptions:

**Riparian Buffer Restoration Project:** MRWC will restore the natural integrity of the Merrimack River shoreline using techniques including the removal of invasive species and the planting of native tree and shrub species in the riparian corridor (50-200 feet from the water's edge). The goal of this project is to reduce runoff and erosion to improve drinking water quality and enhance fish and wildlife habitat. Properly functioning riparian ecosystems have the capacity to filter out non-point source pollution from impervious surfaces and agricultural lands. Without healthy riparian buffers, these pollutants flow directly into the river during rain events. This project will target locations along the Merrimack River Watershed, primarily south of Concord, New Hampshire as well as along nearby tributaries such as the Soucook River, the Suncook River, the Piscataquog River, the Souhegan River, and the Nashua River.

**In-Stream Barrier Removal Project:** Thousands of undersized stream crossings and defunct dams remain scattered throughout the Merrimack River Watershed. These barriers harm in-stream water quality by creating artificial increases in temperature, storing sediments and nutrients behind barriers, and creating conditions for algae blooms. Due to the Merrimack River's industrial history, the sediments behind such barriers can be contaminated with toxic materials, including heavy metals, pesticides, and hydrocarbons. Barriers also prevent fish, reptiles, and amphibians from moving up and downstream and reduce flood resiliency (the built

27

infrastructure is too small for water to flow through during flood events). These dams and undersized culverts in the Merrimack River impede the proper functioning of the River by limiting its ability to cycle nutrients, move sediment, access its flood plain, maintain proper conditions for aquatic life, and provide flood mitigation. This project will prioritize barrier removal where removal will result in improved water quality, the remediation of contaminated sediment, improved aquatic habitat and passage, improved climate resilience, and/or reduced flood impacts. The project will target locations in the Merrimack River Watershed, primarily south of Concord, New Hampshire as well as along nearby tributaries such as the Soucook River, the Suncook River, the Piscataquog River, the Souhegan River, and the Nashua River.

**Water Quality Testing:** MRWC will continue its year-round volunteer water quality sampling program on the Merrimack River, including at sites in New Hampshire. The primary focus of the sampling program is to better understand and quantify levels of bacteria and other pollutants in the Merrimack River, to inform the development of solutions, and to advocate for improvements. MRWC also uses water quality sampling to inform residents of potential risks from pollution until solutions can be implemented.

**Outreach and Education:** MRWC will conduct outreach and education work to ensure that community members and residents have an accurate understanding of the issues facing the Merrimack River, the potential risks to humans and wildlife from those issues, and potential solutions that everyone can take part in. Participants will learn about creating rain gardens, installing rain barrels, reducing/limiting activities that contribute to non-point source pollution (fertilizers, household chemicals, and non-disposed pet waste), and participating in organized efforts to restore riparian zones, clean up rivers/riverbanks, and remove invasives. MRWC plans to develop and carry out education and outreach events using a water quality focused curriculum

for youth and adults in cities and towns along the Merrimack River and its tributaries. Audiences could include youth at Boys and Girls Clubs and town summer programs, urban communities, and events open to the public.

## II.    GENERAL OBLIGATIONS AND REPORTING

A.    **Annual Reports:** The Implementing Organization will submit to the Parties, pursuant to Section XI (Notices), annual status reports according to the requirements of Paragraph 34.

B.    **Unspent Funds:** Any project funds that remain unspent as of the Termination Date will be directed to community environmental projects in New Hampshire that are similar to or serve similar purposes as the Environmentally Beneficial Projects. In the event that unspent project funds exist, the Implementing Organization will submit to the Parties an accounting of such funds and a description of the intended use for such unspent project funds.